**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| JAQUELL DIXON, )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>DORIS WOODRUFF-FIBLEY, et al., )<br>)<br>Defendants. ) | 1:04-cv-1374-DFH-VSS |

**Entry Discussing Defendants' Motion for Summary Judgment
and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment must be **granted.**

**I. Background**

Plaintiff Jaquell Dixon ("Dixon"), an inmate at the Miami Correctional Facility, an Indiana prison, was formerly confined at the Correctional Industrial Facility ("CIF"), another Indiana prison. The defendants are Doris Woodruff-Filbey ("Woodruff-Filbey"), Chaplain Gleason Hackett ("Chaplain Hackett"), and Sgt. Sammy Mena ("Sgt. Mena"). Dixon alleges that the defendants denied his right to free exercise of religion in September of 2002, when he was not allowed to pray outside his cell. Dixon seeks declaratory relief and money damages. The defendants seek resolution of Dixon's claims through the entry of summary judgment.

Dixon alleges that on August 12, 2002, Woodruff-Filbey informed him by letter that congregational prayer was authorized on Fridays and that individual prayer was allowed in housing areas or cells. He asserts that he was denied his right to free exercise of religion on September 2, 2002, when Sgt. Mena told him that he could not pray outside his cell. Dixon further alleges that on September 5, 2002, defendant Woodruff-Filbey informed Chaplain Hackett that group prayer was not authorized in the housing unit common areas, and that same day the Chaplain informed Sgt. Mena that inmates were to pray only inside their rooms.

Summary judgment is proper when there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Scott v. Trump Ind., Inc.,* 337 F.3d 939, 945 (7th Cir. 2003). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant].'" *Oest v. Illinois Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Judgment as a matter of law is appropriate when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## II. Undisputed Facts and Conclusions of Law

### A. Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment:

1. In 2002, Woodruff-Filbey was employed by the Indiana Department of Correction ("DOC") as Director of Religious Services and Community Involvement. Chaplain Hackett is employed by the DOC at the CIF as a Chaplain.

2. The DOC requires the approval of facility religious programs and practices that are consistent with security and order.

3. Individual prayer is permitted in an offender's cell or bed area as authorized by facility operational procedures.

4. To the best of Woodruff-Filbey's knowledge, the CIF did not permit individual prayer within the housing unit outside an offender's cell in 2002.

5. On or about August 12, 2002, Woodruff-Filbey responded to correspondence sent by Dixon regarding Islamic prayers in the gym during recreation. In that correspondence, Woodruff-Filbey stated that congregational prayer was authorized on Fridays, and that "Muslim offenders may pray individually in their housing area or cell, or as authorized." She further stated that group prayer and religious activity was limited to that authorized by the facility and was based on security. She suggested that Dixon contact Chaplain Hackett for information on procedures regarding individual and group prayer.

6. Woodruff-Filbey's correspondence was not meant to approve any area at the CIF for individual or group prayer not authorized by the facility Superintendent.

7. Believing that Woodruff-Filbey's letter permitted him to pray in his housing area outside his cell, Dixon prayed outside his cell for approximately one

month. During the month of September, Dixon was given three conduct reports: two for refusing an order and one for threatening another with bodily harm.

8. The CIF Operational Procedure XXIV, related to DOC Policy 01-03-101, states that "[s]pace for other than scheduled religious programming and pastoral care services shall be provided within the limitations of supervision and physical space as approved by the Superintendent/designee."

9. Offender-led religious group meetings and/or prayers are not authorized in the housing units for reasons of security.

10. Such meetings require the oversight of a Chaplain or designated staff who are not available in the housing unit. Correctional officers assigned to the unit cannot adequately supervise such a group and perform their other required functions at the same time.

11. Individual prayer outside of one's cell/bed area also would require extra monitoring by correctional staff to avoid potential disturbances with other offenders in the common area or the blocking of doors, entrances or exits generally causing a potential fire hazard.

12. It is a guideline of the DOC to allow Muslim offenders to pray in their cells or bed areas. This practice was in effect at the CIF in August 2002.

13. Muslim offenders are not permitted to pray in the common areas of the housing units.

14. The prohibition on prayer in common areas of the facility was created to prevent unauthorized religious meetings of offenders in those areas.

15. On September 5, 2002, Chaplain Hackett sent Sgt. Mena correspondence outlining the current practice regarding prayer because Sgt. Mena had requested the information. Chaplain Hackett confirmed that offenders were to pray in their rooms, not outside their rooms on the range nor in the common area.

16. Chaplain Hackett did not decide to transfer Dixon from the CIF to the Miami Correctional Facility on or about January 26, 2005. Chaplain Hackett did not make any decisions regarding the facility transfers of offender Dixon.

17. Chaplain Hackett does not have any decision-making power regarding facility transfers of offenders. Decisions regarding facility transfers of offenders are made by the Classification Department of a facility or the DOC.

### B. Conclusions of Law

*1.    First Amendment Denial of Religious Freedom Claim*

Dixon alleges that the defendants denied his First Amendment freedom to exercise religion when they refused to allow him to pray outside his cell. He argues that this was done without citing to any policy, procedure or rule and was done in violation of DOC policy and CIF Operational Procedure. He alleges that his prayers are considered invalid if he prays in the midst of images, such as pictures, portraits or drawings of living objects. He alleges that his cell-mate has images displayed on the wall and the television screen.

It is reasonable that Dixon understood Woodruff-Filbey's August 12, 2002, letter to mean that individual prayer was allowed in his housing area outside his cell. Woodruff-Filbey states that by her letter she meant that where individual prayer was permitted on the housing unit was determined at the discretion of the CIF. Dixon was given subsequent clarification shortly thereafter when he was advised by Sgt. Mena, who had requested the information from Chaplain Hackett, that Dixon was not allowed to pray outside his cell.[1]

"[A] prisoner is entitled to practice his religion insofar as doing so does not unduly burden the administration of the prison. But, conversely, a prison is entitled to enforce its regulations, even if they crimp a prisoner's religious style, if the regulations are reasonably related to legitimate penological objectives." *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (internal citation and quotation omitted). "A prisoner's right to freely exercise his religious beliefs does not depend upon his ability to pursue each and every aspect of the practice of his religion." *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir. 1996). "A prison may restrict a prisoner's ability to adhere absolutely to a particular tenet of his religion, and if the prison has sound penological interests supporting the restriction and, if those interests outweigh the prisoner's religious interests, the restriction does not violate the First Amendment." *Id.*

Prohibiting Dixon from praying outside his cell did impinge on his right to practice his religion. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

---

[1]Dixon argues that the practice of denying individual prayer outside an inmate's cell is not supported by a particular DOC or CIF rule or policy, however, whether a practice is codified as a specific policy is not dispositive. Here, the Director of Religious Services for the DOC and the prison Chaplain have stated what was permitted at the prison in relation to individual prayer, and evidence of such a practice is sufficient. "[T]he regulation *or practice* in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (emphasis added) (quoting *Procunier v. Martinez,* 416 U.S. 396, 413 (1974)).

(1987) ("The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security."); *Williams v. Lane,* 851 F.2d 867, 877 (7th Cir. 1988) ("[P]rison officials may not interfere with a prisoner's free exercise of religion unless the asserted regulation is justified by a legitimate penal interest.").

There are several factors to consider in determining whether a practice is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison practice and the legitimate governmental interest put forward to justify it;  (2) whether the prisoner has an alternative means of exercising his religion; (3) the impact accommodation of the asserted constitutional right would have on guards, other inmates, and the allocation of prison resources in preserving institutional order; and (4) the existence of "obvious, easy alternatives" to the practice. *Turner*, 482 U.S. at 89-90.

The practice in place at CIF at the relevant time was that offenders were not allowed to pray in the common areas of the housing units, and instead they were allowed to pray in their individual cell area. The defendants argue that there are legitimate penological interests basis for this practice, namely security and staffing issues.

In relation to the first factor, Dixon argues that there is no evidence that his prayer outside his cell in fact caused any disturbances or blocked any entrances. The defendants, however, need not show that these events actually occurred. Rather, they must show that the practice or policy of prohibiting individual prayer outside one's cell is rationally connected to legitimate interests such as reducing the potential for disturbances between offenders and the efficient use of staff. Allowing offenders to pray outside their cell could lead to unauthorized group meetings within the housing unit. Moreover, allowing inmates to pray in common areas would require additional monitoring of those areas by correctional staff. Security concerns and the allocation of prison staff are certainly valid reasons for limiting activity outside of the individual cell area. Accordingly, there is a rational connection between the practice of allowing inmates to pray only in their cells and not outside one's cell, and the prison's interests in maintaining order and the efficient use of staff. Second, Dixon is not prohibited from practicing his religion entirely nor is he prohibited from praying. "Courts are particularly deferential to the policy judgment of corrections officials in cases where other avenues remain available to inmates for the exercise of the asserted right." *Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (citing *Turner*, 482 U.S. at 90). Third, it has already been noted that allowing offenders to pray outside their cells would require additional personnel to monitor those offenders and to ensure that they were not creating hazards such as blocking doors, entrances or exits.  Therefore, the "impact on guards, other inmates, and prison resources" factor weighs in favor of the defendants. Finally, Dixon has not pointed to any easy, obvious alternative which would fully accommodate his rights while maintaining the same penological interests. In sum, each of the *Turner* factors weigh in favor of the defendants. Accordingly, the defendants did not violate Dixon's First Amendment rights when they prohibited him from praying outside his cell. The defendants are entitled to summary judgment.

### *2.     Retaliation Claim*

Dixon alleges that Chaplain Hackett retaliated against him by transferring him from the CIF to the Miami Correctional Facility in January of 2005. To succeed on his First Amendment retaliation claim, Dixon must prove by a preponderance of the evidence that he engaged in constitutionally protected activity, the defendant acted in retaliation, and that Dixon's protected activity was a motivating factor in the defendant taking retaliatory action. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). Dixon does not allege in what protected activity he engaged. Even if the court assumes for purposes of the motion for summary judgment that the protected activity was either prayer or the filing of this lawsuit, Dixon's claim does not survive summary judgment because he has not opposed the defendants' evidence which shows that Chaplain Hackett was not personally involved in the decision to transfer Dixon.

It is well-settled that in a § 1983 case, to be liable for damages, an individual must have personally participated in the alleged constitutional deprivation. *Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir. 2000); *see also Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (to be liable for the deprivation of a constitutional right, an individual must personally participate in the deprivation or be personally responsible by directing the conduct or having knowledge of and consenting to the conduct). It is undisputed that Chaplain Hackett did not have any authority to order transfers of prisoners from one facility to another and in particular, he had no involvement in the decision to transfer Dixon from one prison to another. Accordingly, Chaplain Hackett is entitled to summary judgment with respect to Dixon's retaliation claim.

### III.  Conclusion

Although the actions taken and practices and policies enforced by the defendants did impinge on Dixon's right to free exercise of religion, they did not violate the First Amendment because they were reasonably related to legitimate penological interests. In addition, Dixon has failed to come forward with evidence creating a disputed question of material fact in relation to his claim that Chaplain Hackett retaliated against him by transferring him to another prison. The defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment must be granted.

Judgment consistent with this Entry and with the Entries of November 15, 2004, and February 16, 2005, shall now issue.

So ordered.

_David F. Hamilton_
DAVID F. HAMILTON, Judge
United States District Court

Date:   9/14/2006